Milligan, J.,
delivered the opinion of the Court.
These causes, which consist of bill and cross-bill, were consolidated with the case of Mary Ruth McCarty and others vs. James White, administrator of Robert P. Kyle, deceased, and all heard together, under the following state of facts and pleadings: In the Winter, or early in the Spring of 1855, James P. McCarty, who is now dead, and who is the father of the complainants *350 in the original bill, and the defendants in the cross-bill, entered, as it appears, into a negotiation with Robert P. Kyle, who has also since died, whereby he agreed to exchange the farm he then resided on, in Hawkins County, estimated to be worth at the time from $5,000 to $6,000, for the one-half interest which the said Robert P. Kyle owned in certain leases of land in Carrol County, Virginia, and which were supposed to contain large quantities of copper ore, of great value. These leases were held by a joint stock company, composed of various gentlemen, among whom was Robert P. Kyle. On some of them, the presence of copper ore had already been demonstrated, and the excitement consequent upon such discovery ran very high. The stockholders dreamed of sudden wealth by a single turn of the wheel of fortune; and the most cautious and prudent citizens in the State, as the record discloses, vested their capital freely in these lands. Joint stock companies everywhere sprang up, and the shares often sold at most fabulous prices. In the midst of this wild excitement, James P. McCarty, the ancestor of the complainants, who is shown to have been a sagacious business man, contracted to exchange his homestead, together with about $600 of personal property, which comprised the bulk of his fortune, for the one-half interest of Robert P. Kyle in the “Union Mining Company.”
At the time of this transaction neither Kyle or McCarty had seen the copper lands in Virginia. They both seem to have judged of their value by the prices at which copper leases in that locality were then ruling, *351 and the general estimate placed upon them by an excited community.
Soon after this negotiation, McCarty’s family removed to Rogersville, and R. P. Kyle entered upon the tract of land now in dispute, and took possession of it, together with about $600 worth of stock and other personal property, which McCarty, as it is alleged, was to give him for his one-half interest in the copper mines, in addition to his real estate. McCarty, about this time, visited the mines in Virginia, and, after inspecting them, expressed himself fully satisfied with his trade, and had his name entered as a stockholder on the books of the “Union Mining Company,” and attended and participated in the company meetings. But, unhappily, his bright hopes of future wealth were suddenly terminated by death. He never returned to his family, but died in Virginia, intestate, on his first visit to the mines.
Soon after, his heirs brought ejectment against Kyle, who was then in possession of the land, pending which, Kyle also died, and this suit was revived against his heirs at law. Afterwards, in Nov., 1862, the complainants, as heirs at law of James P. McCarty, deceased, filed their bill in the Chancery Court at Rogersville, against his administrator, James White, in which they allege that James P. McCarty, their ancestor, was the owner of the land in controversy at his death, and that his family removed to Rogersville after he went to Virginia, for the purpose of educating the children; and that R. P. Kyle had, without authority, entered upon the land, and continued to hold and cultivate it until his death, in 1861. This bill sought an account for *352 rents and profits; but, before it was determined, tbe late Avar supervened, and suspended the action of the Courts. The record and papers in the action of ejectment, through the casualties of the war, were lost or destroyed; and in 1866, the complainants filed another bill, against Mary Robert Kyle, the infant daughter and sole heir at law, of R. P. Kyle, deceased, in which the destruction of the record in the ejection suit is recited, and its loss sought to be supplied. This bill alleges that the ancestors of the parties, in their lifetime, commenced negotiations for the exchange of McCarty’s lands in Hawkins County, for the one-half interest of Kyle in the Virginia copper mines; but, that the parties disagreed, and McCarty went to Virginia, and died before the contract was closed, or reduced to writing; and that R. P. Kyle entered upon the land, and he and his heir at law, have held the possession, and received fhe rents and profits, ever since. They further charge, that McCarty was greatly deceived in the value of the mineral lands held by the “ Union Mining Company,” and that they have proved very expensive and totally worthless.
To this bill Mary Robert Kyle answered, by her guardian, and filed her answer as a cross-bill, in which all the essential equities set up and relied on in complainants’ second bill, are, in substance, denied; and, by way of cross-bill, she alleges that the contract of sale between her father and McCarty, in their lifetime, was consummated and reduced to writing, which has been since lost or destroyed; and that her father, before his death, took possession of the land with the full approbation and approval of McCarty; and asks that the possession *353 be restored, if tbe evidence of the contract was a deed, and if only a title bond, that it be specifically executed.
In the answer to the cross-bill, it is denied that any conveyance was executed, but it is admitted that a memorandum, “ in pencil,” was drawn up to aid in the preparation of a title bond, which was afterwards to be more formally written out, but the parties disagreed, and no further writing was ever executed.
The Chancellor decreed for the complainants; from which an appeal in error is prosecuted to this Court.
Three prominent questions are presented in the record. The first is a question of fact; and the other two, questions both of law and fact.
1. The first question is purely one of fact, and. lies at the threshold of the case: What was the nature of the transaction between J. P. McCarty and R. P. Kyle? Was the contract an assurance of title to the land, a title bond merely, or an agreement to convey ?
But little light is shed on this question, in the pleadings. The original bill, as we have seen, denies that there ever was any assurance of title executed by the parties in their life-time; and the' answer which is filed as a cross-bill, avers there was either a deed or bond for title, which has been lost or destroyed. The answer to the cross-bill admits the existence of a memorandum of the contract “in pencil,” but avers it was never formally executed.
The whole question turns on the proof, and it demonstrates, beyond a doubt, the existence of an agreement between J. P. McCarty and R. P. Kyle, whereby the former agreed to exchange his farm in Hawkins County, *354 for the one-half of Kyle’s interest in the copper-mines in Virginia; and that the substance of this agreement was reduced to writing, first uin pencil,” and afterwards copied into ink. But, whether this instrument was a mere memorandum of the contract, a title bond, or an assurance of title, does not distinctly appear. But the weight of the testimony is clearly in favor of the latter. The witness, Bice, who drew the memorandum in pencil, and McFarland, who afterwards copied it in ink, state, in substance, that it was neither a bond for title, or a deed; but a joint obligation, setting forth the terms and conditions of the trade. This statement is corroborated by other facts and circumstances in the case. Both parties signed the instrument, and other witnesses say, deeds were to be mutually executed thereafter. So that there is little doubt resting on the mind, that the writing between the parties was a mere memorandum of the contract, which was to be more formally executed thereafter.
But the contents of this memorandum are not proven, further than in general terms; nor does it appear, who had the custody of it, or how it was lost or destroyed. All these points are left in doubt, which can only be resolved by inference.
2. But, assuming the existence of this memorandum of the contract, is it presented in this record in such a form as a Court of Equity would specifically execute it ?
In the answer to the cross-bill, the statute of frauds is relied upon; and, in order to have the contract specifically executed, it is clear, a writing required by *355 tbe Statute, must be produced; or, if lost or destroyed, its contents must be proved with reasonable certainty. Does tbe writing proven, meet tbe rule laid down by this Court, in tbe case of Sheid vs. Stamps’ Adm’r, etc., 2 Sneed, 172. “A memorandum of tbe sale of lands, to be eifectual, must be signed by tbe party to be charged, and must contain tbe substantial terms of tbe contract in itself, or in some other writing to which it refers: 14 John. Rep., 15.
Tbe form of tbe contract is immaterial. But tbe fact of a sale, and its terms, embracing a designation of tbe parties to it, and the land sold, must appear with reasonable certainty, in tbe writing relied on, or some other to which it refers. Less than this cannot satisfy tbe requirements of tbe Statute: 2 Sneed, 172.
Tbe existence of a memorandum of the contract, or agreement, in this case, is proven; but, as we have seen, tbe witnesses do not assume to speak of tbe terms and conditions of that agreement. As to these, we are left wholly to inference. Some of tbe witnesses say, tbe writing was not a deed, or a title bond, but an agreement of tbe parties to convey; but none of them assume to speak of tbe contents of tbe writing. Whether it contained a description of tbe property agreed to be exchanged, tbe boundaries of the land, or such other description as would reasonably identify it, or the quantity of interest in tbe mines to be exchanged, or such other requisites necessary to constitute a contract, or an agreement for tbe sale or exchange of lands, on which a suit could be brought against the parties signing it, certainly does not appear in this record. Without these essential *356 requisites, (were the memorandum of the agreement present,) a Court of Equity would not execute it; and certainly, no less evidence of the contents of such written instrument, when the original is lost, will satisfy the demands of the law. We cannot infer the terms of the contract; they must he affirmatively proven: Sheid vs. Stamps’ Adm’r, 2 Sneed, 172; Blair & Gillenwater vs. Snodgrass & Lyon, 1 Sneed, 1; Pipkins vs. James, 1 Hum., 325.
3. But, admitting this agreement was such a contract as could he supported by the statute of frauds, is it, as presented in this record, such an agreement as a Court of Equity would specifically execute?
The specific execution of a contract is decreed at the sound discretion of a Court of Chancery; but it is a jurisdiction so important, and so long and frequently exercised, that the principles by which it is governed, are nearly as well settled, as if it was regulated by positive enactment: Cocke vs. Evans, 9 Yerg., 287—298; Samuel Humbard’s heirs vs. Aiden Humbard’s heirs, 3 Head, 100.
These principles are so clearly laid down in the case of Cocke vs. Evans, above cited, and they have been so uniformly followed in this State, that we have deemed it proper here to incorporate some of them in this opinion. “In order to entitle a party to a specific performance of a contract,” says Judge Turley, who delivered the opinion of the Court, “it must be fair, certain, just, equal in all its parts, and for an adequate consideration: Cutheral vs. Ogilvie, 1 Dess., 257. A specific performance of a contract will not be decreed, when it is hard or unreasonable in itself, or when, from material change of *357 circumstances since the contract, the performance would be attended with any particular hardship: Perkins vs Wright, 3 Har. & McHen., 324.
“To entitle the complainant,” continues the learned Judge, “to the specific performance of a contract, it must appear, not only that the contract was, in all respects, full, fair and honest in the beginning; but that the performance of it may be fairly and conscientiously required.
“The Court will not interfere to decree a specific performance, if there be suspicion of unfairness, or if it would be a hardship on the defendants: Hall vs. Ross, 3 Haywood, 262.” See, also, Trigg vs. Reed, 5 Hum., 529; Blair & Gillenwater, Adm’rs, vs. Snodgrass & Lyon, 1 Sneed, 1.
Applying these principles to the case under consideration, does it present such a state of facts as to move the Court to the active exercise of this extraordinary power of a Court of Chancery? We think not. The contract was made at a most unpropitious period for calm and deliberate action. The wildest excitement on the subject of mineral lands, seems to have pervaded alike, both parties to the agreement; and while it is apparent the hopes and expectations of the one were greatly disappointed, it is due to the memory of the other, that he took no undue advantage of him. The contract itself, is tainted with no actual fraud. Both seem alike to have been deceived in the present value of the copper lands. The mines were not open, and their real value then, as now, was merely speculative. McCarty had never seen them, and could have known *358 nothing about them, except from the representations of others. Like the gambler, he risked his whole fortune in a single transaction upon an uncertainty; and time has shown, he lost. The mines have yielded little or nothing; but, on the contrary, they have proved a source of continued loss, amounting, to the company, to not less than $50,000 or $60,000, without any return. Their value is still speculative; and, in the opinion of all the witnesses, cannot be made profitable without the employment of a heavy capital in their development. Does such a contract as this, commend itself to the conscience of a Court of Chancery? Is it fair, just and equal in all its parts, and for an adequate consideration? Is it hard and unreasonable in itself, and have the circumstances materially changed since it was executed; and above all, would its execution be attended with particular hardships to the defendants in the cross-bill ? These are the tests by which we are governed, and when applied to the facts disclosed in this record, demand an affirmative answer.
Affirm the decree of the Chancellor.